UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| FRANK ATUAHENE, Ph.D., | ) | Civ. 07-4099-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING |
| | ) | MOTION FOR |
| SOUTH DAKOTA STATE | ) | SUMMARY JUDGMENT |
| UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Frank Atuahene, brought a complaint against South Dakota

State University (SDSU), alleging that he was discriminated against based on

his race and national origin, in violation of Title VII of the Civil Rights Act of

1964. Docket 32. SDSU moves for summary judgment. Docket 47.

Additionally, SDSU moves to strike Atuahene's second response to SDSU's

motion for summary judgment, Docket 65, which Atuahene opposes. Docket

67. Atuahene has also requested an extension of the discovery deadlines.

Docket 68. For the reasons stated below, SDSU's motion for summary

judgment is granted, SDSU's motion to strike is denied, and Atuahene's motion

to extend discovery deadlines is denied as moot.

### FACTUAL BACKGROUND

The relevant facts, viewed in the light most favorable to Atuahene, the

nonmoving party, are as follows[1]:

---

[1] These facts are taken from Defendant's Statement of Undisputed
Material Facts, Docket 49, as addressed by Atuahene's Response to
Defendant's Motion for Summary Judgment, Docket 61. While Atuahene
discussed some of SDSU's statements of undisputed material facts, he failed to

Atuahene is of African descent and was born in Ghana, Africa. Atuahene was hired by SDSU on August 15, 2003, as an assistant professor in the Construction Management Program of the Department of Engineering Technology and Management. The job notice for his position stated that SDSU's Department of Engineering Technology and Management was seeking professors to "[t]each courses for the Construction Management program." Docket 51-2. In a letter to Atuahene dated April 3, 2003, which discussed SDSU's hiring of Atuahene, Dr. Darrell DeBoer, acting head of the College of Engineering, stated that "[b]ased on your qualifications, I will recommend that you receive two (2) years of service toward tenure. This is subject to Board of Regents approval." Docket 51-3; Docket 61-15. Atuahene's nine-month appointment began August 15, 2003, and ended May 15, 2004. The appointment was a tenure-track position and was subject to annual renewal. The offer letter also stated an intention to provide summer salary support for one or two months during the summer of 2004, contingent upon current funding levels.

_____

address each one. See Docket 61; D.S.D. CIV. LR 56.1 (stating that a party opposing a summary judgment motion "shall respond to each numbered paragraph in the moving party's statement with a separately numbered response and appropriate citations to the record" or risk admitting the statement). The court is to broadly construe the pleadings of a pro se plaintiff, and in that spirit will read Atuahene's filing opposing the summary judgment motion generously, despite Atuahene's failure to comply with Local Rule 56.1. Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 652 (1972) (per curiam); Stone v. Harry, 364 F.3d 912, 914 (8th Cir. 2004).

Atuahene's workload consisted of 15 work units per semester, or 30 work units during a 9-month, 2-semester appointment. In the fall 2003 semester, Atuahene's workload consisted of 8 units of teaching, 6.5 units of research, and .5 units of advising. At that time, professors Pat Pannell and Wayne Haug, two white professors, were responsible for advising more students than Atuahene and received 1 unit of credit for advising. Docket 61, page 2. During the fall semester, Atuahene taught one section each of the following courses: GE 121, Engineering Graphics; CM 374, Construction Equipment and Methods; and CM 400, Risk Management and Safety. Docket 51-5.

Pursuant to SDSU's policy, Atuahene and Dr. Teresa Hall, Dean of the Department of Engineering Technology and Management, completed a professional staff evaluation (PSE) reviewing the faculty's performance in the previous year and setting goals for the future. PSEs are completed not based on an academic year, but based on a calendar year, and Atuahene's PSE for 2003 was completed on March 10, 2004. Docket 52-2. The PSE includes a section completed by the faculty member discussing his expectations and contributions in the areas of teaching/advising, research/scholarship, and service. See id. at 3-6. The faculty member is also to state major performance objectives for the next evaluation period. Id. at 6-7. The PSE also includes a section to be completed by the immediate administrative supervisor, which Dr. Hall completed. Id. at 8.

In her portion of the PSE, Hall noted that Atuahene had achieved the level of performance "reasonably expected in an Assistant Professor in the area of teaching and advising with like tenure status and comparable professional responsibilities and resources," and she stated that student evaluations were "positive." Id. In the area of research and scholarship, Hall stated that "it is not possible to assess his contributions" at this time because Atuahene had been at SDSU for only one semester. Hall went on to determine that Atuahene's service performance matched the reasonable expectations of someone with his tenure status and professional responsibilities. In summary, Hall stated that Atuahene "is making steady progress in teaching, advising, research and service that is consistent with the tenure and promotion performance standards for an Assistant Professor in the Department of Engineering Technology and Management." Id. at 9.

In the spring 2004 semester, Atuahene was responsible for teaching one section each of the following courses: GE 121, Engineering Graphics; CM 320, Construction Soil Materials; and CM 332, Building Systems. That semester, Atuahene was assigned to 9.67 units of teaching, .63 units advising, and 4.7 units of research and scholarship. When a large number of incoming first-year students required the addition of more sections of GE 121, Atuahene was assigned to another section. GE 121 is an introductory general engineering course with students from a combination of engineering programs, not an advanced course or one specifically in the Construction Management program.

As such, the court concludes based on Atuahene's allegations that the prestige of teaching this course is minimal. SDSU contends that Atuahene was assigned the additional section of GE 121 because he was the only instructor who was available to teach the course on Monday and Wednesday afternoons, it would require minimal preparation, his student evaluations reflected that his teaching effectiveness was higher in that course than the other courses he had taught, and it would only overload his teaching by one work unit, which could be accommodated the next semester by additional release time. Atuahene describes this assignment as equivalent to being a teacher's assistant to Norm Chandler, a "non-tenure track instructor with a Bachelor's degree." Docket 61, page 8. Although Atuahene originally told Hall that he would not teach the additional GE 121 section, he later retracted this refusal. Norm Nusz Chandler and Jerry DeWald also taught two sections each of GE 121, and Atuahene states that the GE 121 instructors other than him were from outside the Construction Management program and were adjunct professors who only taught GE 121. Pat Pannell and David Wahlstrom, both tenure-track white men, were not assigned to teach GE 121 during Atuahene's years at SDSU.

On April 14, 2004, Hall observed Atuahene's CM 320 Construction Soils class. Her notes indicate that the students were bored and inattentive, that Atuahene berated his students, did not have control of the classroom, and did not know "how to be an effective instructor." Docket 52-5. Additionally, Hall observed "[n]o substantial learning to be taking place." Id. Atuahene does not

dispute Hall's observations, other than to say that they conflict with her statements a month earlier that he was "off to a good start," and that after class Hall praised Atuahene for the practical examples he used during class. Docket 61, page 3-4.

Hall and Atuahene met on May 7, 2004, and her notes indicate that the discussion centered on Atuahene receiving summer salary support. Docket 53. Atuahene told Hall about three research projects he planned to complete over the summer, and Hall told him that reviews of reviewed articles are "not the best area to focus his efforts." Id. She said research-based reviewed journal articles and scholarly peer-reviewed articles were preferred and that "at SDSU it was important to perform original research and the resultant publication." Id. Hall also suggested that Atuahene register for the Bush Faculty Teaching Workshop in July 2004 to support his teaching skills. Finally, Hall spoke with Atuahene about her observations of his CM 320 class in April, commending him for being well-prepared but pointing out that the students were bored and inattentive. Atuahene contends that the students were well-behaved, not bored and inattentive. Docket 61, page 4.

At Hall's request, Atuahene later submitted a ranked-order list of his summer research plans, which included the Bush Project Summer Teaching Academy but listed it as his last priority. Docket 53-3. Atuahane also stated his intention to revise a paper based on his dissertation, plan a course of research regarding the capillarity of soils, work on a research proposal on the

sustainability of the water supply in Ghana, and review published articles and write discussions on some of them. Although Atuahene included the Bush seminar on his list of summer research plans, he did not otherwise promise to attend the Bush seminar as a condition to receiving summer support, nor did Hall make receipt of the summer support contingent upon Atuahene's attendance. See Docket 53-4. Atuahene's application for summer research support was granted, and he was given the largest amount of summer support among the CM faculty. Additionally, Atuahene's contract was renewed for the 2004/2005 school year.

Despite his enrollment in the Bush Summer Teaching Academy, Atuahene withdrew from the program the Friday before the week-long academy was to begin. Docket 53-5. Although he notified Hall the day he withdrew, she did not respond to this notice until after the session was underway.

Hall referred Atuahene to Dr. Ali Selim, a professor in SDSU's Civil Engineering Department, expressing an intention to support Atuahene in finding research opportunities and funding. None of the other professors, including white professors Pat Pannell, Wayne Haug, and Norm Chandler, were assigned "mentors." After speaking with Selim, Atuahene contacted Selim and Hall about a transfer to the Civil Engineering Department. Hall and Atuahene met on July 26, 2004, to discuss Atuahene's specific interest in transferring and performance expectations in general. See Docket 54, 54-2. Hall's notes from that meeting reflect that she indicated to Atuahene that her referral to

Selim was not an attempt to get rid of him but was reflective of her desire for Atuahene to succeed at SDSU. When Hall asked Atuahene why he withdrew from the Bush Summer Faculty Workshop, he told her that this was a low priority and it was more important for him to prepare for a teaching assignment in fall 2004. Hall's notes state that she explained that "he was expected to attend the [Bush] workshop to improve his teaching skills and to build a network of persons at SDSU he could go to with questions. He did not seem to grasp the gravity of his action to withdraw." Docket 54. Atuahene also expressed concerns that Pat Pannell was trying to get rid of him by setting up an interview between Atuahene and Hansel Phelps Construction Company. Hall and Atuahene also discussed his student evaluations, and she told him that he would continue to teach GE 121 despite his reluctance to do so. Atuahene expressed concern that he was not given the chance to teach the classes where he would excel, namely Construction Soils and Structural Theory, which he believed he was hired to teach.

Hall and Atuahene also discussed expectations for performance in research for which Atuahene was funded for the summer. See Docket 54. Hall encouraged Atuahene to resubmit a paper based on his dissertation. Atuahene stated that he had been working on a review of another paper. Hall told Atuahene that such research would reflect poorly on him in light of SDSU's preference for other types of research and scholarly work. Hall's notes from the meeting do not reflect any further discussion about Atuahene's summer

research.  At the end of the meeting, Hall told Atuahene that it "was not a bad thing if he chose to leave SDSU in only 2 years," and she gave him "'reasons' why persons change institutions after a short stay."  Docket 54.  Atuahene's characterization of this conversation is that Hall "asked me to go to another place where I will be successful because the student population at SDSU was largely <u>WHITE</u>."  Docket 61, page 29.  The "reasons" Hall discussed with Atuahene about leaving were the fact that the "student population at SDSU was largely <u>WHITE</u> and I was <u>BLACK</u>."  <u>Id.</u> at 30.

The next day, on July 27, 2004, Hall sent Atuahene a memo about their meeting which reiterated that no transfer to the Civil Engineering Department was possible and that Atuahene is to "take advantage of teaching development opportunities" at SDSU.  Docket 54-2.  Hall also emphasized that "refereed journal publications, externally funded research projects, and collaboration on scholarly work are expected activities" from tenure-track professors.  <u>Id.</u> Finally, Hall stated that Atuahene's GE 121 assignment would not change.

Throughout the summer of 2004, Atuahene completed a research-based paper based on his doctoral dissertation and submitted it to the Journal of Geotechnical and Geoenvironmental Engineering.  Docket 61, page 7; <u>see also</u> Docket 61-8 (copy of paper).  Pat Pannell, who was a tenure-track associate professor, had a summer support activity that consisted of service, not scholarship, in that he participated in new student orientation and ACCE

accreditation preparation.  Pannell is a white man who was "not subjected to the same publication requirements" as Atuahene.  Docket 61, page 13.

Student evaluations for Atuahene's spring 2004 classes were not available until the fall of 2004.  In CM 320 and CM 332 Atuahene scored below the comparative mean in the areas of communication, course organization and planning, faculty/student interaction, assignments, exams and grading, and course outcomes.  Docket 55.  In GE 121, Atuahene scored below the comparative mean in some areas, but overall this course scored the best out of his three courses.  Atuahene received the lowest student evaluations among all the professors in the Construction Management program.

Hall met with Atuahene and discussed his student evaluations on August 12, 2004.[2]  Atuahene was visibly upset and shaking, and he complained loudly about his students, stating that they did not like his accent, did not know how to write, did not want to study, and wanted to be given the exam answers.  When Hall told Atuahene that he needed to improve his student evaluation scores, Atuahene replied that he had seen low scores like this before, including at Rutgers University, and they were of no consequence. Docket 57.  When Hall discussed her observations of Atuahene's classrooms,

_____

[2] In his response to this segment of Defendant's Statement of Undisputed Material Facts, Atuahene states that Hall noted on March 10, 2004, that he was "off to a good start."  Docket 61, page 3.  Atuahene seems to relate this statement to his spring 2004 student evaluations.  But Hall made this statement on Atuahene's 2003 PSE, which concerned Atuahene's performance in fall 2003 only.

particularly his habits of cutting off the students and talking to the board with his back to the students, Atuahene did not appear to be listening and stated that these observations were not reflective of his normal classes and that he did not remember talking with his back to the students. Atuahene later testified at a deposition that he disagreed with the spring 2004 student evaluations, and that "it's not my problem, it's the students who've got a problem." Docket 49, page 9.

In a letter dated August 2004 and addressed to Atuahene, Hall stated that she was writing each CM faculty member in order to review goals and share personnel and department information. The letter listed Atuahene's performance objectives from his 2004 PSE and stated that "your efforts and positive contributions to the Department over the past academic year are greatly appreciated." Docket 61-4, page 3. Atuahene believes that this letter was received after his August 12, 2004, meeting with Hall.

In August 2004, Hall informed Atuahene that she would observe each of Atuahene's fall classes. Atuahene mistakenly interpreted this to mean that Hall would sit in on all of his classes on a daily basis, and he sent Hall an email about his dissatisfaction with his teaching assignments. Docket 57-2. When Hall corrected this mistaken belief in an email, Atuahene replied, apologied for the misinterpretation, and stated that he did not wish to pursue the matter further. Docket 57-3. The next time Hall met with Atuahene, she apologized for the confusion and told him it was important to her that he

succeed.  She recommended to Atuahene that he plan something special for the days she would visit Atuahene's classroom or schedule the observation on a day that would highlight his teaching style or methods.

In September 2004, Atuahene was not present in his Construction Materials lab and left his lab assistant to teach the lab.  Atuahene did this because Wayne Haug had told him that the "tradition" was that the lab assistant was responsible for "every aspect of the lab, including the lab exams." Docket 61, page 10.  Haug is a white male.  Pat Pannell, coordinator of the Construction Management program, contacted Atuahene to notify him that the teaching assistant was hired to help the instructor with the lab, not teach the lab, and that Atuahene must be present at all lab sessions.  Atuahene also notes that when David Wahlstrom taught Construction Materials in the fall of 2005, the lab portion of the course was eliminated.

On November 8, 2004, Hall observed Atuahene's CM 216, Construction Materials class.  Hall saw Atuahene read an outline from a text that was on the overhead and noticed that he did not make eye contact with the students. Hall's notes indicated her belief that Atuahene did not understand the extrusion manufacturing process he was lecturing about, that his lecture was one sheet of paper, and that the outline on the overhead was taken from one source, not multiple sources.  Docket 57-5.  Atuahene left the classroom shortly after class began because of problems with the overhead projector, which he had used for over a year without any problems.  Docket 61, page 11.

12

While Hall had not planned to observe the lab portion of CM 216, she decided at the last minute to attend.  Id.  She witnessed the lab assistant teaching the lab and engaging the students about the lesson and an upcoming exam. Docket 57-5.  Atuahene walked in ten minutes late, and he did not speak with the lab assistant.  The lab assistant set up a test machine for the lab exercise. Atuahene observed the test but did not speak to the students or the assistant. Hall noted that he is "acting like a tourist in his lab."  Id.  Atuahene does not dispute Hall's observations of either the classroom or the lab portion of CM 216.

On November 9, 2004, Hall believes that she visited CM 274, Construction Methods and Systems.  Atuahene, however, states that Hall was mistaken and that she visited GE 121 because CM 274 did not include any projects like those she observed on November 9, 2004, and because GE 121 had designated assignment days where the class completed projects like those observed by Hall.  Docket 61, page 12.  Hall came to class without any notetaking items and she wrote nothing during the course of the class.  Id. Hall observed Atuahene writing on the whiteboard directly in front of himself and talking facing the whiteboard, thus preventing the students from seeing what he was drawing or writing.  Docket 58.  She also observed that Atuahene did not look at the students until twenty minutes into the lecture and instead looked at the overhead projector or at the whiteboard.  Id.  Throughout the class Atuahene asked the students to complete a project, and he may have

given the solutions to students who had attempted to complete the drawing. Docket 61, page 12.

On December 3, 2004, Atuahene met Dr. Lewis Brown, Dean of the College of Engineering, to discuss Atuahene's application for tenure and his job performance. Brown expressed concern about Atuahene's commitment to the Construction Management program in light of his refusal to take Hall's professional advice and his desire to transfer to a different program. Docket 58-2. Brown also expressed disappointment in Atuahene's failure to attend the Bush Summer Teaching Academy, which he described as breaching an agreement between Atuahene and Hall. Id. Brown informed Atuahene that he was concerned about Atuahene's failure to meet expectations in the areas of teaching and research/scholarship, and notified him that he will not approve any advance standing toward tenure, such as was discussed at the time of Atuahene's hiring. Id. Brown also told Atuahene that he was investigating the process of non-renewal of Atuahene's contract.[3] Id.

---

[3] Atuahene contends that Brown's decision-making process with regard to the non-renewal of Atuahene's contract was in violation of the Council on Higher Education (COHE) guidelines and the University Faculty Collective Bargaining Agreement. Docket 61, page 13; see also Docket 32, page 2. Atuahene states that Brown should have told him the purpose for the meeting ahead of time and he should have been allowed to have counsel present. Docket 61, page 13-14. Despite these allegations, however, Atuahene has not provided this court with a copy of these alleged guidelines and has failed to offer anything except general allegations on the question of Brown's conduct in deciding not to renew Atuahene's contract. Federal Rule of Civil Procedure 56(e)(2) provides that a party opposing a motion for summary judgment cannot rely on general allegations in its own pleading, but must "by affidavits or as otherwise provided . . . set out specific facts showing a genuine issue for trial."

On February 11, 2005, Hall and Atuahene met to discuss Atuahene's work over the past year in order to complete his 2004 PSE. Docket 58-3. The conversation included discussion about Atuahene's teaching, and Hall specifically shared concerns about his lack of participation in the CM 216 lab. When Atuahene said that Wayne Haug had told him that the assistant teaches the lab, Hall clarified that it was Atuahene's responsibility to teach the lab. Id. at 2. Hall also mentioned Atuahene's failure to attend the Bush teaching seminar the prior summer, even after he agreed to attend, and Atuahene responded that it was not a priority given the amount of his summer support and the other goals he had set for that time period. Regarding Atuahene's research, Hall asked if he had completed any research since his dissertation in 1998, and Atuahene responded that he had been unable to do much research because he had done so much teaching in the first year at SDSU. Id. Hall told Atuahene that SDSU expected him to fulfill responsibilities in the area of teaching, research, and service, and that he was given release time during his time at SDSU to complete research. Atuahene then told Hall that he was told during the interview he would not be expected to perform research, and that SDSU was a teaching institution. Hall expressed that she had been up front with the faculty about the expectations in terms of scholarship, and that it was

_____

Instead, Atuahene has merely relied on the allegations in his pleadings. Therefore, the court will not consider Atuahene's allegations regarding Lewis's compliance with standards adopted by COHE or by SDSU in deciding not to renew Atuahene's contract.

not possible to attain tenure without strong performances in the areas of teaching and research. When Atuahene said that he would work first on his teaching and then do research, Hall told him that he must perform in both areas and that he did not have a very strong start in the first year on either teaching or scholarship. Id.

After this meeting, Atuahene and Hall completed his 2004 PSE in early 2005. Atuahene filled out the first portion, listing his performance objectives and significant contributions in the areas of teaching, research/scholarship, and service. Docket 59, page 4-6. In the area of research and scholarship, Atuahene stated that he had written a discussion on a published article which had been accepted for publication, completed a paper based on his dissertation which was not accepted for publication, reviewed a chapter in a textbook, and participated in writing a proposal for student retention. Id. at 6. In the area of teaching, Atuahene emphasized his preparation for class and his efforts to utilize technology in classroom presentations.

In Hall's portion of the PSE, she stated that Atuahene did not meet the level of expected performance in the areas of teaching and advising, and in research and scholarship. Id. at 9. Hall concluded that "classroom observations by the department head and student evaluations indicate that the instructor is not effective on many dimensions of the teaching role. Dr. Atuahene's difficulty in communicating key concepts, inability to interact with and challenge the students, and failure to deliver a quality learning

experience is of great concern." Id.  Hall mentioned Atuahene's withdrawal from the Bush seminar "without providing a reasonable excuse." Id. Regarding Atuahene's teaching goals, Hall concluded that he had "provided no evidence that he has achieved these goals" despite the resources provided him. In the area of research and scholarship, Hall noted that despite Atuahene's goals, "[t]here have been few tangible results." Id. at 10.  Hall stated that Atuahene's "failure to produce any new research or scholarly activity this year is disappointing as productivity on this dimension is central to meeting performance expectations for promotion and tenure.  The body of work produced by Dr. Atuahene is not sufficient for the time and resources provided over the past year to be considered adequate progress[.]" Id.  In summary, Hall concluded that Atuahene's teaching performance "flagged in the spring 2004 semester and did not significantly improve in fall 2004.  In the area of research, he failed to establish his research program during the past year and he has not produced any new scholarly work." Id.  Hall concluded by stating that she was recommending Atuahene for non-renewal of his contract.  Id. Brown reviewed Atuahene's PSE and signed it, adding that he concurred with Hall's recommendation for non-renewal.  Id. at 11.

On March 2, 2005, Hall sent Atuahene a letter informing him of SDSU's decision not to renew his contract, stating that the reasons for the decision were detailed in his 2004 PSE.  Docket 60.  His employment would therefore end on May 15, 2005.  Atuahene filed a grievance regarding the non-renewal of

17

his contract, but withdrew the grievance on July 19, 2005. Atuahene also filed a complaint of discrimination with SDSU's Equal Employment Officer, who concluded that race and national origin were not factors in the decisions regarding Atuahene's tenure, contract renewal, or course assignments. <u>See</u> Docket 50-3. On May 8, 2006, Atuahene filed a complaint with the Equal Employment Opportunity Commission, which concluded that they were unable to determine whether a Title VII violation had occurred. Atuahene filed this lawsuit against SDSU on July 16, 2007.

**DISCUSSION**

## I.    **Motion to Strike**

SDSU has filed a motion to strike Atuahene's surreply to its motion for summary judgment.

The local rules do not contemplate surreplies to civil motions as a matter of right. <u>See</u> D.S.D. CIV. LR 7.2 (providing 20 days for opposing party to respond to a motion, and 10 days for moving party to reply); <u>see also</u> <u>Kanvick v. City of Reno</u>, 2008 WL 873085, *1 n.1 (D. Nev. Mar. 27, 2008) (stating that neither the local rules nor the Federal Rules of Civil Procedure "provide for second oppositions . . . as a matter of right"). While parties may petition the court for permission to submit a surreply, Atuahene has made no such request. Additionally, courts that have viewed the issue of surreplies have considered whether "the reply which proceeded the surreply contained new information for which the opportunity to respond is needed." <u>Skodmin v.</u>

Oliva, 2006 WL 2711481, *1 (D. Colo. Sept. 20, 2006); see also Jordan v.

Terhune, 2009 WL 276764, *3 (E.D. Cal. Feb. 5, 2009) (citing El Pollo Loco v.

Hashim, 316 F.3d 1032, 1040-41 (9th Cir. 2003)); Kanvick, 2008 WL 873085

at *1 n.1.  The court's review of SDSU's reply brief demonstrates that SDSU

does not raise any additional arguments or present any new evidence, other

than an argument regarding the suitability of the President of SDSU as a

named defendant.  Docket 62, page 1-2.  This new material, however, is in

response to arguments made by Atuahene in his response to SDSU's summary

judgment motion.  See Docket 61, page 1.  Because Atuahene is the one who

raised this issue in the first place, justice does not require an additional

opportunity for Atuahene to more completely address this issue.

Regardless, in light of Atuahene's pro se status, the court sees no harm

in permitting him one more opportunity to meet the challenges of opposing a

motion for summary judgment.  See Thurston v. Burlington N. Sante Fe Corp.,

2008 WL 511889, * 2 n.4 (D. Colo. Feb. 22, 2008); Skodmin, 2006 WL

2711481 at *1.  Additionally, because SDSU's motion for summary judgment is

granted, no prejudice to SDSU arises from the court's refusal to strike the

surreply.  SDSU's motion to strike is denied.

Finally, the court must address one more issue before proceeding. In his

brief opposing the motion to strike, Atuahene stated that his response to

SDSU's motion for summary judgment was also a motion for partial summary

judgment on his behalf.  Docket 67, page 1.  As stated above, courts are to

liberally construe the pleadings of pro se litigants.  <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 652 (1972) (per curiam); <u>Stone v. Harry</u>, 364 F.3d 912, 914 (8th Cir. 2004).  A plaintiff's pro se status, however, does not "'entitle him to disregard the Federal Rules of Civil Procedure."  <u>Bennett v. Dr Pepper/Seven Up, Inc.</u>, 295 F.3d 805, 808 (8th Cir. 2002) (citing <u>Ceridian Corp. v. SCSC Corp.</u>, 212 F.3d 398, 404 (8th Cir. 2000)).  Atuahene's response to SDSU's motion for summary judgment is not properly presented as a motion for summary judgment because it fails to adhere to the federal and local rules concerning such motions.  Fed. R. Civ. P. 56; D.S.D. CIV. LR 56.1.  This fact, along with the court's determination below that SDSU is entitled to summary judgment, leads this court to decline to consider whether Atuahene is entitled to summary judgment.

## II.     Motion for Summary Judgment

### A.     President of SDSU as a Named Defendant

In his response opposing SDSU's motion for summary judgment, Atuahene argues that "[a]ttorneys for Defendants' [sic] have failed to defend the President of SDSU who is a co-Defendant in the amended complaint, therefore Plaintiff deserves partial summary judgment against the President of SDSU."[4] Docket 61, page 1.  While Atuahene's initial complaint named SDSU as the

---

[4] As stated above, the court does not consider Atuahene's request for partial summary judgment against the President of SDSU, as this is an improper motion under the relevant federal and local rules.

only defendant, Atuahene's amended complaint names both SDSU and the President of SDSU. Docket 32. SDSU responds by stating that Atuahene failed to obtain leave of court to add a defendant to the complaint in violation of Federal Rule of Civil Procedure 15(a)(2). Docket 62, page 1. SDSU also argues that Atuahene failed to effectuate service of process on the President of SDSU in violation of Federal Rule of Civil Procedure 4(c). Id. at 1-2.

Federal Rule of Civil Procedure 4(c)(1) provides that a summons notifying the defendant of an action against him "must be served with a copy of the complaint." Rule 4(l) states that "[u]nless service is waived, proof of service must be made to the court." See also Fed. R. Civ. P. 4(d) (discussing the waiver of service). "Unless a defendant voluntarily makes an appearance or waives defective service, a federal court is without jurisdiction to render personal judgment against a defendant if service of process is not made in accordance with applicable federal or state statutory requirements. This principle remains true despite any actual notice a defendant may have of the lawsuit." Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982); see also Printed Media Serv., Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993).

The docket identifies no filing that is either a waiver of service from the President of SDSU or proof of proper service on the President of SDSU. Nor has the President of SDSU made an appearance in this matter or filed an answer to Atuahene's amended complaint. Atuahene argues that SDSU's President had actual notice of the lawsuit, citing to the sheriff's return of

summons.  <u>See</u> Docket 64, page 1-2; Docket 22 (return of service).  But this return of service is in relation to the *original* complaint, which did not name the President as a defendant.  Atuahane has failed to submit proof that he served the summons and the *amended* complaint on the President of SDSU so as to notify him that he is being sued personally.  Accordingly, because no service of the amended complaint has been shown, and because this court lacks jurisdiction over a defendant who has not been properly served, the President of SDSU is not properly named as a defendant.  More than 120 days have elapsed since the filing of the amended complaint, which means that service cannot now be completed.  <u>See</u> Fed. R. Civ. P. 4(m).  Atuahene's claims against the President of SDSU are dismissed without prejudice.  <u>See</u> <u>Hoffmann v. United States</u>, 21 Fed. Appx. 528, 529 (8th Cir. 2001).

### B.    Summary Judgment Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(c).  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment is not appropriate if

a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  While summary judgment "is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim."  Whitley v. Peer Review Systems, Inc., 221 F.3d 1053, 1055 (8th Cir. 2000).

## C.    Disparate Treatment Claim

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Additionally, "an unlawful employment practice is established

when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other facts also motivated the practice." Id. at § 2000e-2(m). Atuahene claims that SDSU acted unlawfully when it assigned him undesirable courses, withheld credit toward tenure, and failed to renew his contract because of his race and national origin.

To evaluate a Title VII disparate treatment claim based on indirect evidence, courts use the burden-shifting framework outlined in McDonnell Douglas Corp. v. Green. 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

> "Under the McDonnell Douglas framework, a presumption of discrimination is created when the plaintiff meets [her] burden of establishing a prima facie case of employment discrimination. A minimal evidentiary showing will satisfy this burden of production." Once a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate "a legitimate, non-discriminatory reason for its adverse employment action." If the employer meets its burden, "the presumption of discrimination disappears, requiring the plaintiff to prove that the proffered justification is merely a pretext for discrimination." The plaintiff has the burden of persuasion at all times.

Davis v. KARK-TV, 421 F.3d 699, 704 (8th Cir. 2005) (citations omitted).

### 1. Prima Facie Case of Discrimination

"To establish a prima facie case of discrimination, [plaintiff] must show that: (1) [he] is a member of a protected class; (2) [he] met the legitimate expectations of [his] employer; (3) [he] suffered an adverse employment action; and (4) similarly situated employees that were not members of the protected

class were treated differently." Davis, 421 F.3d at 704 (citing Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003)). Of the four factors in a prima facie case, SDSU challenges only whether Atuahene met the legitimate expectations of his employer. To meet the burden of demonstrating that he met the legitimate expectations of SDSU, Atuahene "must demonstrate that [he] was actually performing [his] job at a level that met [his] employer's legitimate expectations." Whitley, 221 F.3d at 1055.

The Eighth Circuit case of Shanklin v. Fitzgerald, 397 F.3d 596, 602-03 (8th Cir. 2005) is instructive. In that case, an African-American teacher was terminated because she "received unfavorable evaluations, and she failed to cure her serious and repeated performance deficiencies, even after the Board gave her an additional five months to improve." Id. at 602. Furthermore, her supervisors "found serious performance deficiencies in Shanklin's relationships with students and her inability to structure lessons effectively and provide educational guidance." Id. at 602-03. In response to this significant evidence provided by defendant, the plaintiff "offered no evidence, other than her own bald assertions, to contradict the Board's evidence," merely stating that she doubted the reasons stated by the board. Id. at 603. "Shanklin's questioning of her reported deficiencies is insufficient to create a genuine issue of material fact, where such assertions are totally unsupported by the record." Id. (citing Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994)). As Shanklin failed to establish that she met the legitimate expectations of her

employer, she failed to establish a prima facie case of race discrimination, and an award of summary judgment for defendant was affirmed.  Id.

Here SDSU, the employer, has provided much evidence supported by the record that Atuahene failed to meet its legitimate expectations in the areas of teaching performance and research and scholarship, thus justifying its conduct toward Atuahene.  In support of this contention, as in Shanklin, SDSU has produced specific evidence of Atuahene's deficiencies in his teaching abilities–evidence which, for the most part, Atuahene does not dispute.  This evidence includes Atuahene's poor and worsening student evaluations that were significantly below the comparative mean scores and, often, the worst in the Construction Management department; Hall's observations made during Atuahane's classes that he was not an effective teacher and that he had difficulty communicating key concepts and engaging with and challenging the students; Atuahene's withdrawal from the Bush Summer Teaching Academy; and his lack of involvement, leadership, or attendance in some lab settings.  SDSU also states that, when confronted with criticism from students or Hall about his teaching, Atuahene could not admit that he needed to make any improvements to his teaching style.  Atuahene's failure to recognize any deficiencies in his teaching is borne out by Atuahene's response to the summary judgment motion where Atuahene does not dispute Hall's specific observations during his classes nor the fact that he received low student evaluation scores, while he argues that SDSU was not justified in its actions

toward him. Atuahene's general allegations about the timing of SDSU's decisions and the existence of favorable comments made by Hall regarding Atuahene are insufficient to refute SDSU's specific and significant evidence of Atuahene's poor teaching performance. <u>Shanklin</u>, 397 F.3d at 602-03; <u>see also</u> <u>Whitley</u>, 221 F.3d at 1055; <u>see also</u> <u>Smith v. Datacard Corp.</u>, 9 F. Supp. 2d 1067, 1079 (D. Minn. 1998) (finding no prima facie case because plaintiff "has not adequately bolstered her allegations with sufficient factual support"). Because Atuahene has failed to establish that he met SDSU's legitimate expectations, he cannot establish a prima facie case of race discrimination. But there are genuine disputes of fact as to the nature and extent of Atuahene's research. Because the court found that Atuahene failed to meet SDSU's legitimate expectations in the area of teaching, however, it need not examine whether Atuahene satisfied SDSU's expectations for research and scholarship.

Because Atuahene has failed to demonstrate that he was actually performing his job at a level that met SDSU's expectations, he cannot establish a prima facie case of discrimination, and for this reason alone, SDSU is entitled to summary judgment.

### 2. Pretext

Even if the court were to find that Atuahene met SDSU's legitimate expectations for performance and had, therefore, made a prima facie case for discrimination, SDSU would still be entitled to summary judgment because

Atuahene cannot establish that the nondiscriminatory reasons given by SDSU for the adverse employment action are pretextual. As stated above, step 2 of the <u>McDonnell Douglas</u> test requires the employer to advance a legitimate, nondiscriminatory reason for its actions involving the complaining employee. <u>Johnson v. AT&T Corp.</u>, 422 F.3d 756, 762 (8th Cir. 2005). SDSU has met this burden by asserting that its conduct regarding Atuahene was based upon his poor performance in the area of teaching and scholarship. See <u>Davis</u>, 421 F.3d at 705 (stating that this burden "is not onerous"). With regard to Atuahene's assignment to teach General Engineering 121, SDSU maintains that this class assignment was due to Atuahene's availability during the course's scheduled time, and due to the fact that his student evaluations were higher in GE 121 than in his other classes.

The burden now shifts to Atuahene to establish that these asserted reasons were a pretext for racial discrimination. <u>Shanklin</u>, 397 F.3d at 602. To carry the burden of showing pretext, a plaintiff must show that defendant's justification for the adverse employment action is "unworthy of credence." <u>Erickson v. Farmland Industries, Inc.</u>, 271 F.3d 718, 726 (8th Cir. 2001) (citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)). "To show an employer's proffered reason was pretextual, a plaintiff must not only 'discredit[] an employer's asserted reasoning for terminating an employee,' [he] must 'show that the circumstances permit a reasonable inference to be drawn that the real reason

28

[for termination] was because of [his] race." <u>Twymon v. Wells Fargo & Co.</u>, 403 F. Supp. 2d 921, 941 (S.D. Iowa 2005) (quoting <u>Johnson v. AT&T Corp.</u>, 422 F.3d 756, 763 (8th Cir. 2005)).  Courts are not to act as "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." <u>Davis</u>, 421 F.3d at 705 (quoting <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1136 (8th Cir. 1999)).

Atuahene does not dispute that poor teaching performance is a legitimate reason for SDSU's conduct in denying him credit toward tenure and deciding not to renew his contract.  <u>See</u> <u>Johnson</u>, 422 F.3d at 762.  And to oppose the significant amount of evidence regarding Atuahene's poor teaching performance, Atuahene merely asserts that Hall's comments on his teaching were contradictory and "subjective" and were based on insufficient student evaluations.  See Docket 61, page 4 (stating that Hall's observation that the students were "bored" was an inaccurate assessment of students who were "well-behaved"); <u>id.</u> at page 20 (accusing Hall of "hiding comments that will prove that I was <u>effective</u> on many dimensions of the teaching role" but providing no cites to supporting documentation in the record).  Atuahene does not establish, or even argue, that white professors whose teaching performance was similarly deficient were treated differently by SDSU.  <u>See</u> <u>Twymon</u>, 403 F. Supp. 2d at 946.  Instead, in arguing the existence of pretext, Atuahene merely contends that the facts create an inference of discrimination that can be

reached based on the way SDSU employees treated him. Without more, however, Atuahene's argument fails. Id. (citing Stuart v. Gen. Motors Corp., 217 F.3d 621, 635-36 (8th Cir. 2000) (holding that proof that may establish a prima facie case was insufficient to establish pretext)); see also Shanklin, 397 F.3d at 603 (stating that plaintiff "must present some evidence, direct or indirect, that she was discharged because of her race"); Erickson, 271 F.3d at 729 (finding no pretext when professor "did not improve in the specific deficient areas in which she repeatedly was counseled"); McMiller v. Board of Trustees of the Univ. of Illinois, 275 F. Supp. 2d 974, 981 (N.D. Ill. 2003) (awarding summary judgment because plaintiff "has not offered evidence sufficient to create a genuine issue of material fact as to whether defendant's articulated reason was pretextual"); Rheams v. Marquette Univ., 989 F. Supp. 991, 1007-08 (E. D. Wis. 1997) (holding that plaintiff did not establish pretext by doing "little more than argu[ing] her personal conclusion that the reason for her not having her contract renewed must have been race"). Because Atuahene does nothing more than make conclusory allegations that SDSU's decisions regarding his employment were based on his race and national origin, without providing adequate facts to support such allegations, he cannot establish that the reasons given by SDSU for its actions were pretextual.

On the question of Atuahene's assignment to teach multiple sections of GE 121, Atuahene has also failed to introduce evidence of pretext beyond mere conclusory allegations. He does not dispute that he was available during the

course's scheduled time while other instructors were not, nor does he challenge SDSU's allegations that his evaluations for this course were the highest of all his courses. Atuahene merely alleges that he was given this undesirable teaching assignment while other white professors were not similarly burdened. Such conclusory allegations are insufficient to permit a reasonable inference that the real reason for SDSU's conduct was his race or national origin. See Johnson, 422 F.3d at 763. Because Atuahene has not demonstrated that SDSU's asserted reasons for assigning several sections of GE 121 to Atuahene is "unworthy of credence," he cannot establish that this proffered reason is pretextual. See Erickson, 271 F.3d at 726.

Finally, in his briefs responding to the summary judgment motion, Atuahene raises several allegations, namely, that Hall asked him "to go to another place where I will be successful because the student population at SDSU was largely WHITE." Docket 61, page 29 (referencing Hall's notes from the July 26, 2004, meeting with Atuahene). Atuahene also says, without specifying a context or date, that Hall "advised me to leave SDSU because I was a black person working in an area with a large white population." Id. at 30. Again, Atuahene does not cite to the record in making this allegation. See Fed. R. Civ. P. 56(e)(2). These statements, argues Atuahene, are evidence that the reasons given by SDSU for its conduct toward Atuahene were pretextual.

Viewing these allegations in the light most favorable to Atuahene, they do not create a genuine dispute of fact for trial. In examining the effect of "non-

contemporaneous statements," "*some* causal relationship is necessary to demonstrate the significance of non-contemporaneous statements, or statements made by persons other than the relevant decision-maker, to the resolution of the ultimate issue of intentional discrimination." Reynolds v. Land O'Lakes, Inc., 112 F.3d 358 (8th Cir. 1997) (citing Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 779 (8th Cir. 1995)). Here, these alleged statements by themselves are insufficient to create an inference of discriminatory animus. See Smith v. Firestone Tire & Rubber Co., 875 F.2d 1325, 1330 (7th Cir. 1989) (stating that evidence of stray remarks made by employer "were not shown to be related to [plaintiff's] demotion and are simply insufficient to rebut the weight of the detailed and documented testimony by the defendant concerning [plaintiff's] work performance"). Further, these alleged statements were not made contemporaneously to SDSU's decisions to deny tenure credit and withhold the contract renewal, but were supposedly made months before SDSU expressed an intention to investigate non-renewal of Atuahene's contract. Because Atuahene fails to present some facts to support the existence of a "causal relationship" between SDSU's conduct and these statements, these statements are insufficient to establish that SDSU's proffered explanations were pretextual.

As stated above, Atuahene has failed to establish that he met the legitimate expectations of SDSU, and therefore he cannot establish a prima facie case of racial discrimination. Thus, SDSU's motion for summary

judgment is granted.  In the alternative, even if this court were to find that Atuahene had met his burden of making out a prima facie case of discrimination, summary judgment would still be granted in SDSU's favor because Atuahene has failed to demonstrate that the explanations proffered by SDSU for its conduct toward Atuahene were pretextual.

For the reasons stated above, it is hereby

ORDERED that SDSU's motion to strike (Docket 65) is DENIED.

IT IS FURTHER ORDERED that SDSU's motion for summary judgment (Docket 47) is GRANTED in accordance with this order.

IT IS FURTHER ORDERED that Atuahene's motion to extend discovery (Docket 68) is DENIED AS MOOT.

Dated June 4, 2009.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE